I'm Charles Mitchell for the Petitioner. This is a case involving the Convention Against Torture in which the immigration judge and the Board of Immigration Appeals found that the petitioner had been tortured by the government in Nigeria. She credibly testified to having been arrested in Nigeria on several occasions between 1983 and 1987 while participating in political demonstrations and having been beaten and raped by Nigerian police several times. The BIA also noted that Petitioner had been subjected to female genital mutilation, FMG, and stated that it is undisputed that FMG as practiced in Nigeria constitutes torture within the meaning of the Convention Against Torture. The BIA also noted that Petitioner's during a political demonstration in 2006. Despite finding that the petitioner had been tortured in the past, the majority in this divided BIA decision determined that she could not show a likelihood that she would be tortured in Nigeria in the future for three reasons. First, the majority determined that female genital mutilation that she suffered as a child constituted past persecution but did not raise a regulatory presumption of future persecution. If I understand it, the government has suggested to us in a 28J letter that that issue should, if we get to it, that issue should go back to the BIA to let them take a first shot at it. Which might be. I think you would agree with that. Which would also be a cause for having this case remanded. That's what he's saying. As the AT case has been withdrawn. As I said, they seem to agree that on that issue it should be remanded. Right. On that one. Now, on the second one, the majority suggested the petitioner could suppress her expression of thoughts and political beliefs, which, as I said, might create a probability of torture where that probability would otherwise not exist. The BIA noted that she had been significantly less involved in Nigerian politics since she had been living in the United States. The third reason is the majority determined that Petitioner could avoid torture by relocating outside the Niger Delta region. Well, the second reason is the interesting one. I think so. If I understand what they're saying, and you can correct me and maybe elaborate, if I understand what they're saying is since you don't have to engage in political activity when you go back there, you can stay home and do nothing. Forget any spillover from the past. But in the future, you don't have to do anything. And therefore, you're not at risk of being tortured. Seems to be what they're saying. So I mean, that's the question. What level is the alien required to curtail normal activities? Could she be required to avoid being seen in public or avoid all human contact? Requiring an alien to abstain from the expression of political beliefs as a basis of denying relief under CAT is contrary to fundamental rights under U.S. and international law. The guidelines for the United Nations High Commissioner for Refugees notes that it is unreasonable to assume that political beliefs will sooner – it is reasonable to assume that political beliefs will sooner or later find expression. The U.N. Universal Declaration of Human Rights states that everyone has the right to freedom of opinion and expression. This right includes freedom to hold opinions without interference and to seek, receive, and impart information and ideas through any media, regardless of frontiers. As far as the U.N. High Commission and such is concerned, if I recall, the Supreme Court has said to us something to the effect that, well, the statements by the High Commission, et cetera, are peachy keen, but that doesn't affect the BIA's authority. In other words, we couldn't say, well, BIA, the High Commission says something different. Therefore, we rule that way. Is that correct? You know, it's like the hour process, the hour v. Robbins, where you look at, is the regulation ambiguous, and if yes, is the agency's interpretation controlling? It would be controlling unless it's clearly erroneous or inconsistent with regulation. Here we have pretty clear inconsistency. This Court, in several decisions, a Chinese case, Zhang Vyashkov, in which the Court rejected the notion that Zhang should be required to practice his religion in secrecy in order to avoid persecution. A case from Mozambique, Mamouzian Vyashkov, that said he didn't have to renounce his anti-government beliefs in order to avoid persecution.  upon a person returning to their country in order to avoid persecution? But those are not convention against torture cases, right? Well, it's not convention against torture, but it goes to the idea of, you know, what level — and there's not a lot on that. What level do you have to go to in order to — to what extent can the government impose conditions upon a person returning to their country? The government, the DIA says, well, suppose a person said, let's think, I'm a kleptomaniac, and if you deport me to country X, I'll try, but I'm almost certain to commit a theft. And if I commit a theft, they will then torture me. The DIA says, well — they suggest, anyway — well, that's no basis. That's almost precisely what the case was, the DIA case, in which someone from Dominican Republic who had committed rape and was mentally imbalanced, and he said that if he goes back to Dominican Republic, the word he would — he would be rowdy, and he might — if not up his medications, he might commit crimes. And the DIA, in its opinion, you know, noted that this is a — this is a different kind of situation we have here. It's not just speculative. I mean, here, this person was clearly in the past subjected to torture by the government. And, you know, usually there's a presumption that that will occur. And — Make it a fact that she went back for several — was it two years and didn't engage in political activity? She went back for a matter of four weeks. In 1992, she went back to get a — simply for the reason of trying to get a visa at the consulate. Well, for whatever reason, she was able to keep her political opinions to herself. Yeah. And basically in hiding, she had a guard that the family hired to escort her to the consulate. You know, that's a sort of — I think that's similar to the argument the government makes, that there was a couple of years that went before — you know, after 87, when she remained in Nigeria and came here. And what's the answer — what's your answer to that? Well, she was extremely traumatized. She, you know, did keep under hiding. She was, as she's stated on the record, you know, scared to death at that time and trying to find some way to get out of the country. You know, there's a whole logic — Go back in a lifetime — lifetime — I'm sorry. The logic of the BIA's ruling, if I understand it, is this woman is an aggravated felon. So we start with that. She viciously attacked somebody else and went to prison for it. This is, generally speaking, the kind of alien we try to remove from the country. Right. Given that, given the fact that she can apparently go and live there and keep her political views to herself when she wants to, why is the — why did the BIA abuse its discretion? There's no question that she's — she committed an aggravated felony. She's not eligible for asylum. She's not eligible for restriction on removal. But convention against torture is not a discretionary form of relief. The attorney general is required to grant — even if the person is not found credible, if they were found to have lied in their testimony, if they committed a terrible crime in the United States, if the person — if there's a very high likelihood that person would be subjected to torture — But she can trigger the torture or avoid the torture, depending on her own conduct. Yeah. And secondly, it's not meant to be punitive. Is that true, what I just said? She can avoid it. She can either avoid torture or she can bring it about, depending on her own voluntary conduct. Well, that's speculative. But if she's going — you know, if she — she could have — I guess we could hypothetically say she could avoid — if she never went out in public, if she, you know, just stayed in the house, had people run errands for her — Well, you're talking about — If she never had contact, I don't — No, there's no evidence that she would be tortured if she went outside the house. You're just making that up. Well, she's — does she have to express herself? I mean, can we say that she's not allowed to speak? Or what freedoms? You know, given the treatment that she suffered in the past, I think she probably would have very strong views on that. And I think that there's quite a bit under the United Nations that says that she should be entitled to express them. Thank you. Thank you. I see you've used up your time. So we'll go now to the government. Morning. Good morning. May it please the Court, the excess mercy of the Office of Immigration and Vacation for the Respondent. There are two main issues before the Court today. First of all, and as Your Honors pointed out, whether the Board could properly take into account that the petitioner had the option of avoiding political demonstrations that she had in the past in determining whether it was more likely than not the petitioner would be tortured under the Convention Against Torture. And the second issue, of course, is whether the petitioner is entitled to deferral or move on to the Convention Against Torture solely on the basis of having been subjected to female genital mutilation. As I suggested, just to reach the second issue first, as I suggested in my 28-J, given the change in the Board's law in a matter of AT, the government feels that if the Court were to reach this issue, that it would be best to possibly remand it to the Board to reconsider its decision in light of this intervening law. However, as Your Honors pointed out, the main issue before the Court today, then, is whether the Board properly was able to decide under the regulations of the Convention Against Torture that the petitioner could possibly refrain from certain political activities, in this case political demonstrations, to avoid being tortured upon her return. In that respect, if I understand it, the IJ first said she was credible. The BIA never upset that credibility finding. The IJ, therefore, said she was tortured in the past and she does intend or plan to engage in political activity in the future. I find those as facts. So we know that part's true. I take it. Yes, Your Honor. So the question is, can the BIA say, well, you don't have to do that? Well, as Your Honor pointed out, the relevant question here, first of all, there's the legal question. Can the Board do this under the regulations? And the second part of that question is, does the factual evidence back up that finding? And here, the government's position is that the factual evidence back up which finding? I'm sorry? Does the factual evidence back up what finding? The finding that the Petitioner can refrain from her political activities in Nigeria. And- Well, let's assume people can do that. I mean, obviously, anybody can refrain from doing anything. So that seems like a simple question. That fact seems simple. If I understood Your Honor's question correctly, however, you were asking if the record supported the Board's finding. And the government's position is that it does. She clearly testified that for two years, while she was living in Nigeria, she was living in Lagos. She was working at a private hospital. And she did engage in some political activities while she was there. She said she went to meetings. However, she refrained from participating in political demonstrations. She didn't voluntarily put herself in harm's way. And when she went back, admittedly only for four weeks, she again was able to refrain from participating in political demonstrations again. The Board looks at that record and says, despite the fact that you testified that you would possibly become involved in political demonstrations again, there's ample- She didn't say possible. She said, I will. I will. She said- And that's taken to be a credible statement. She will. Well, under the regulations, the burden is to show whether or not it's more likely than not she would be tortured. Can I ask you something? This is the burden. And I'm having a very difficult time getting my mind around the Board's approach to this. So let me shift it. Suppose a person is a Pentecostal and says, you know, if you send me to country X and I practice my Pentecostal religion in country X, I will be tortured. If I understand the Board's theory as well, you don't have to do that. You don't have to practice your Pentecostal or you can sit at home and light candles or whatever you want to do, but you don't have to go to Pentecostal church. You don't have to preach on the streets. Jehovah's Witnesses, one of their tenants says you preach on the streets. You don't have to do that. You can just stay home and stuff. What do we do? What do we do that? We say, oh, that's right. I mean, I take it that the theory is since she doesn't have to, then that person would not be entitled to cat relief. Is that right? The Board does explain that not in every circumstance would they find that a person could voluntarily refrain from certain behavior. They, addressing some of the dissent's concerns about this, they specifically state, we intend no blanket declaration that protection under the Convention against Torture is unavailable for reasons of race, religion, nationality, political opinion or social group membership in cases where the aliens lack eligibility for either asylum withholding. But as your honors pointed out, I'm referring to the record page 131. It's the third page, I believe, of the Board's decision. I'm sorry, fourth page of the Board's decision. It's April 19th, 2006 decision. They make no blanket declaration that in every case that someone could refrain from certain activity. Well, here's their bottom line. After stating their rule, they say, this holds whether the voluntary behavior is a new criminal act in the country or something such as political activism that we would ordinarily protect under the provisions of the immigration law. So if you go back there, they say, if you make a non-frivolous assertion that you will voluntarily engage in activity that will create a probability of torture, you don't get catapulted. That's what they say. That's the rule. Are we — and you're saying that's right. Is that correct? They're looking at it as a very fact-based — I'm reading what they're — that's a legal statement. It's certainly a legal statement, but they're saying that in the — in this particular case, she showed that the political behavior was voluntary. She showed that — Don't you think the case for political voluntary — for political behavior is not voluntary? What act — that act of political behavior is not voluntary? You mean if the — if it's like Patty Hearst with the SLA, if they're holding a gun to your back and say, go out and engage in it, is that what they're talking about? The balance here is that she's — she refrained from political activity previously. So if you — so if you got real scared for a couple years because you had just been raped and almost killed and got really scared for a couple years and said, you know, I'm feeling very pusillanimous, and so I'm going to protect myself, and then later on you say to yourself, you know what, pusillanimity doesn't get you into heaven, I'm not going to do that anymore, I'm going to stand up for my rights, then you say, well, too bad. For a couple years, you've been raped and slashed and almost killed, and for a couple years, you didn't participate in political activity, ergo, obviously you can refrain. And that's OK, then. Is that what you're saying? Well, as I think actually, as the board points out, though, the — what they were doing here was setting up the fact that they can find that someone can voluntarily refrain from something under certain circumstances. However, they are finding it on a case-by-case basis. As I stated in their paragraph after the one that you cited, they're saying that there's no blanket declaration here, but simply that under the regulations, as Your Honors pointed out, as she is only eligible for deferral under CAT, there's no special protection for any of the — for either race, religion, nationality, political opinion, or social group membership. And in this particular case, in dealing with the political activities that she is engaged in, there is evidence that she would be more likely than not tortured because she has been able to refrain from politics in the past and would be able to do so in the future. For that reason, the board's decision is, as counsel conceded, the court owes deference to the — to the board's interpretation here. And the board's interpretation is neither — is neither plainly erroneous or else otherwise — I'm sorry — is neither plainly erroneous or inconsistent with the regulation. Therefore, the court should defer to the board's interpretation. Thank you very much. Thank you. Thank you. The case just argued is submitted. Good morning to both sides.
judges: Duffy, Fernandez, Silverman